# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-3316

STEPHEN TOLIVER,

*Petitioner-Appellant,*

*v.*

GARY R. MCCAUGHTRY, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02 C 1123—**Patricia J. Gorence,** *Magistrate Judge.*

ARGUED SEPTEMBER 5, 2007—DECIDED AUGUST 27, 2008

Before POSNER, RIPPLE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Stephen Toliver was convicted by a jury of first-degree intentional homicide (as a party to a crime), in violation of sections 940.01 and 939.05 of the Wisconsin Statutes. Mr. Toliver was sentenced to life in prison. After exhausting his state remedies, he filed in the district court a petition for a writ of habeas corpus. *See* 28 U.S.C. § 2254. The district court denied relief, and Mr. Toliver timely appealed to this court.

For the reasons set forth in this opinion, the judgment of the district court is reversed, and the case is remanded for proceedings consistent with this opinion.


# I

## BACKGROUND

### A. The Facts and Mr. Toliver's Criminal Trial

Mr. Toliver's state conviction arose out of the murder of Tina Rogers. In 1991, Mr. Toliver and his brother, Oliver Toliver, were living with Commosie Thompson, Jo-Etta Foster and Tina Rogers. Thompson was selling drugs out of the residence and discovered that $1,800 in drug proceeds was missing. Thompson told Mr. Toliver, who had been serving as Thompson's drug courier, about the missing money. Mr. Toliver informed Thompson that Rogers had taken it.

Mr. Toliver then told his brother Oliver to "strap up"; both men grabbed firearms and went looking for Rogers. R.30, Ex. 2 at 3. Both Foster and Thompson testified that, from their observations that evening, they did not believe that Mr. Toliver or Oliver intended to harm Rogers upon finding her. Mr. Toliver testified that he had told Oliver to "strap up" because their house had been "shot up" several weeks after Rogers had moved into the house and they suspected that Rogers' boyfriend, whom Mr. Toliver believed to be violent, had been involved in the shooting. *Id.*, Ex. 8 at 30.

Upon finding Rogers, Mr. Toliver and Oliver brought her back to the residence; upon their arrival, Thompson,

Corey Henry, Darian Robinson and Foster were present. Once inside, Mr. Toliver began questioning and arguing with Rogers about the missing money; Rogers denied taking it. Foster testified that Oliver, who had a TEC-9 handgun in his hand, went over to Mr. Toliver, who also was holding a firearm, and whispered something. Mr. Toliver then began yelling at Rogers.[1] Mr. Toliver then tossed his sawed-off shotgun next to Thompson and told him to shoot whomever he thought had stolen the money (including Mr. Toliver himself); Thompson did not respond, and Mr. Toliver picked up the shotgun.

At this point, Oliver moved aggressively toward Rogers, but Mr. Toliver pushed him away. Henry testified that Mr. Toliver had told Oliver to "chill out and sit down." *Id.*, Ex. 5 at 17. Mr. Toliver then asked Thompson what he intended to do. Thompson responded, "Whatever is clever." *Id.*, Ex. 8 at 42. Robinson testified that Mr. Toliver had asked Thompson whether he was sure. Thompson testified that Mr. Toliver then had stepped back. Oliver then got up and shot Rogers once in the forehead at point-blank range.

What Mr. Toliver said next remained in dispute at trial. Thompson and Robinson each testified that they heard Mr. Toliver say some variation of "[k]ill that bitch, kill her." *Id.*, Ex. 4 at 36; *id.*, Ex. 6 at 56. Foster testified that,

---

[1] At this point, Foster testified that she, thinking that this would be a long argument, left the room to cancel a reservation that she just had made. Foster further testified that she did not reenter the room until after she heard the first gunshot.

after hearing the first gunshot, she reentered the room and saw both Mr. Toliver and Oliver standing by Rogers, who was slumped on the floor bleeding profusely; Oliver had his gun pointed at Rogers' head. Foster testified that she then heard Mr. Toliver say, "shoot the bitch." *Id.*, Ex. 7 at 80. Mr. Toliver, however, testified at trial that he had said, "you done killed the bitch." *Id.*, Ex. 8 at 44. After Mr. Toliver's comment, Oliver again shot Rogers in the head.

## B. Wisconsin State Court and District Court Proceedings

On January 30, 1992, Stephen Toliver was convicted by a jury in the Milwaukee County Circuit Court of first-degree intentional homicide (as a party to a crime), in violation of sections 940.01[2] and 939.05[3] of the Wisconsin Statutes. The court sentenced him to life imprisonment. After sentencing, Mr. Toliver filed a pro se appeal.

---

[2] Section 940.01 states: "[W]hoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony."

[3] Section 939.05, in relevant part, reads:

(1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not directly commit it and although the person who directly committed it has not been convicted . . . .

(2) A person is concerned in the commission of the crime if the person:

. . . .

(b) Intentionally aids and abets the commission of it. . . .

On direct appeal to the Court of Appeals of Wisconsin, Mr. Toliver brought, inter alia, a sufficiency of the evidence claim. Mr. Toliver argued that the evidence against him was circumstantial and insufficient. The Wisconsin appellate court rejected this characterization of the evidence, explaining that

> [w]e need not belabor the facts further to determine that they overwhelmingly establish that Stephen instigated the homicide, enlisted his brother Oliver's assistance, and intended to cause Rogers' death. Although Oliver immediately caused Rogers' death, it was Stephen who intentionally directed it and assisted in it.
>
> Stephen argues that the evidence was circumstantial. It was not. Four eyewitnesses testified to Rogers' bloody and merciless execution-style murder at the hands of the Tolivers.

*State v. Toliver*, No. 93-0510, at 5 (Wis. Ct. App. May 10, 1994) (R.19, Ex. C). The Wisconsin appellate court also stated: "The facts . . . overwhelmingly establish Toliver's culpability, indeed his leadership, for this savage murder. Four eyewitnesses' evidence, the murder weapon and Toliver's shotgun, the wrappings for Rogers' body and a plethora of other evidence were presented or described to the jury." *Id.* at 14. The court affirmed Mr. Toliver's conviction.

One judge concurred in the court's judgment but did "not join in the reasoning of the majority in all respects." *Id.* at 17. Although he did not state whether he agreed with the majority's characterization of the evidence against

Mr. Toliver, the concurring judge noted, "On several issues, I am troubled by the way in which the majority seems to ignore or inadequately address Toliver's arguments." *Id.*

After the Supreme Court of Wisconsin denied Mr. Toliver's petition for review, he proceeded under, and exhausted, his Wisconsin state habeas remedies.

Mr. Toliver then filed a habeas petition under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Wisconsin. On November 9, 1999, the district court granted conditionally Mr. Toliver's petition on the ground that he had been deprived of his right to counsel during his pro se direct criminal appeal in Wisconsin state court. *Wisconsin ex rel. Toliver v. McCaughtry*, 72 F. Supp. 2d 960, 979 (E.D. Wis. 1999). The district court ordered that Mr. Toliver be released or that the state court permit him to refile his direct appeal with the assistance of counsel.

The state chose the latter course, and Mr. Toliver, represented by counsel, consequently returned to the state trial court as part of his reinstated direct appeal.[4] Mr. Toliver contended, inter alia, that his trial counsel had provided ineffective assistance of counsel and that the prosecution had failed to disclose exculpatory evidence.

With respect to the ineffective assistance of counsel claim, Mr. Toliver submitted affidavits from Angeal

---

[4] Wisconsin law allows a convicted defendant to file a post-conviction motion in the trial court as part of his or her direct appeal. *See* Wis. Stat. § 974.02.

Toliver and Harvey Toliver. The affidavits, which we describe in more detail below, disclosed that these two individuals had offered to testify on Mr. Toliver's behalf. According to Mr. Toliver, the testimony offered in the affidavits tended to show that Oliver had acted alone when he shot Rogers and that Mr. Toliver did not otherwise intentionally aid and abet Oliver's murder of Rogers. Mr. Toliver argued that his trial counsel was ineffective for failing to call Angeal Toliver to testify during his criminal trial and, in the case of Harvey Toliver, for failing to interview him.

With respect to the exculpatory evidence claim, Mr. Toliver submitted an affidavit from Cornell Smith. The affidavit, which we also discuss in more detail below, disclosed the existence of a letter that Smith claims to have sent to Mr. Toliver's prosecutor prior to the criminal trial. According to the affidavit, the letter that Smith allegedly had sent to the prosecutor disclosed statements that also tended to show that Oliver had acted alone when he shot Rogers and that Mr. Toliver had attempted to dissuade Oliver from killing Rogers. Mr. Toliver argued that Smith's letter constituted exculpatory evidence that was not, but should have been, disclosed to him prior to trial.

The state trial court denied Mr. Toliver's post-conviction motion, and he appealed these two issues, among others, to the Court of Appeals of Wisconsin. The Court of Appeals of Wisconsin, as discussed in more detail below, affirmed Mr. Toliver's conviction as well as the trial court's denial of post-conviction relief. *State v. Toliver*, No.

00-2460, 2001 WL 1084999 (Wis. Ct. App. Sept. 18, 2001) [hereinafter *Toliver II*]. The court held that the evidence against Mr. Toliver was overwhelming and that, therefore, there was no reasonable probability of a different result had Mr. Toliver's counsel called Angeal Toliver and Harvey Toliver to testify or had the contents of Smith's letter been disclosed to Mr. Toliver's defense counsel.

Mr. Toliver then filed another habeas petition under 28 U.S.C. § 2254 in the Eastern District of Wisconsin. The district court denied that petition on January 31, 2006. Mr. Toliver timely filed a notice of appeal and requested from the district court a certificate of appealability. On April 24, 2006, the district court granted Mr. Toliver's request for a certificate of appealability ("COA") on four of the six issues that he raised before that court. After studying the briefs and the record and after oral argument, we granted a COA on the remaining two issues. *See* 28 U.S.C. § 2253(c)(2). Both the State and Mr. Toliver subsequently submitted supplemental briefs.

## II

## DISCUSSION

### A. Habeas Corpus Standards of Review

We review de novo the district court's denial of a habeas petition. *Daniels v. Knight*, 476 F.3d 426, 433 (7th Cir. 2007). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we may grant habeas relief only if the state court's "decision was contrary to, or involved an unreasonable application of, Supreme Court precedent," *id.*, or

"resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

To grant habeas relief under the "contrary to" clause, we must find that the state court reached a result opposite to that reached by the Supreme Court on materially indistinguishable facts. *See Terry Williams v. Taylor*, 529 U.S. 362, 405 (2000); *Jackson v. Miller*, 260 F.3d 769, 774 (7th Cir. 2001). To warrant relief under the "unreasonable application" clause, a habeas petitioner must show that the state court's decision unreasonably extended a clearly established Supreme Court precedent to a context where it should not have applied or unreasonably refused to extend such a precedent to a context where it should have applied. *Jackson*, 260 F.3d at 774. Furthermore, the state court decision must be "both incorrect and unreasonable." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000); *see also Terry Williams*, 529 U.S. at 407-08. The state court's factual findings are presumed correct; this presumption can be rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003); *see also Barrow v. Uchtman*, 398 F.3d 597, 603 (7th Cir. 2005).

## B. Ineffective Assistance of Counsel Claim

Mr. Toliver submits that he was deprived of his right to effective assistance of counsel and that, in holding otherwise, the Court of Appeals of Wisconsin unreasonably

applied *Strickland v. Washington*, 466 U.S. 668 (1984). In connection with his post-conviction motion, Mr. Toliver submitted two affidavits—one from Angeal Toliver and another from Harvey Toliver—indicating that each affiant would have testified on Mr. Toliver's behalf. We turn to the substance of those affidavits.

**1.**

Angeal Toliver's affidavit recounts a conversation that she had with Mr. Toliver's mother and Jo-Etta Foster, who had been present in the house during Rogers' murder and testified against Mr. Toliver. Mr. Toliver's mother and Angeal asked Foster what had happened on the evening of the Rogers murder. Foster told them that Mr. Toliver had nothing to do with Rogers' murder. That evening, Foster explained that she was in her bedroom when she heard a gunshot; she then yelled Mr. Toliver's name and looked out her bedroom door. At that point, Foster saw Mr. Toliver trying to wrestle a gun away from Oliver and heard Mr. Toliver exclaim, "[Y]ou shot the bitch, or something like that." R.30, Ex. 11 at 1-2. Oliver then shot Rogers again, after which Mr. Toliver succeeded in wrestling the gun away from Oliver. Foster explained that the reason that she had not told the police this was because the police had threatened to charge her. Angeal's affidavit concludes by stating that she had explained all of this to Mr. Toliver's trial counsel and that he had told her that he was placing her on Mr. Toliver's witness list. Angeal, however, was never called to testify.

Harvey Toliver's affidavit relates a conversation that he had with the Toliver brothers after the Rogers murder. While the Toliver brothers were driving Harvey home, Harvey asked them why the police were questioning them about the Rogers murder. Mr. Toliver immediately said, "[B]ecause this crazy nigger, meaning [Oliver], killed her." *Id.*, Ex. 9 at 1. Harvey inquired as to Oliver's motive in killing Rogers. According to Harvey, Oliver said, "[B]ecause she was a dope feined [sic] bitch and deserved to die." *Id.* Mr. Toliver then became upset and responded by telling Oliver, "[Y]ou shouldn't have killed her because it wasn't any of our business if this woman . . . did or didn't steal Commosie's dope and money, it wasn't [your] business." *Id.* Oliver stated that Rogers had made him angry when she laughed after Commosie asked her if she stole his money, "so he shot the bitch and he said he didn't like her anyway." *Id.* Harvey's affidavit continues to explain that Mr. Toliver told Oliver that he was not going to take the blame for him and that "if they got arrested that [Oliver] would have to take his own weight because he, [Mr. Toliver], will tell the police the truth about what happened." *Id.* Oliver stated that "he would accept that if it came to that and he would confess to what he did because he wouldn't let his brother, [Mr. Toliver,] take the blame for what he had done." *Id.* Mr. Toliver then expressed regret at having helped Oliver move Rogers' body and said it was "stupid" on his part. *Id.*

Harvey's affidavit then recounts how Mr. Toliver had called Harvey from a county jail and had explained that Oliver had confessed to the murder but then had claimed that the confession had been coerced. Mr. Toliver asked

Harvey if he would be willing to speak with Mr. Toliver's counsel and relate the conversation that he had had with the Toliver brothers. Harvey's affidavit states that he expressed some reluctance about taking sides between the two brothers, but he ultimately told Mr. Toliver that he would speak to Mr. Toliver's counsel if it became necessary. Mr. Toliver told Harvey that he should expect to hear from his counsel soon. The affidavit explains that Mr. Toliver's counsel never contacted Harvey.

**2.**

On direct review, the Court of Appeals of Wisconsin rejected on the merits Mr. Toliver's ineffective assistance of counsel claim. The appellate court correctly identified the Supreme Court's decision in *Strickland* as governing a claim of ineffective assistance of counsel. Under *Strickland*, a defendant must prove that his lawyer "fell below an objective standard of reasonableness" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687-88, 694. In this case, the appellate court dismissed Mr. Toliver's *Strickland* claim on the prejudice prong, without addressing the deficient performance prong.

As for Angeal's statement, the court noted that Mr. Toliver argued that the statement would have impeached Foster's testimony that Mr. Toliver said "shoot the bitch." *Toliver II*, 2001 WL 1084999, at *11 ¶ 47. The court, however, concluded that no prejudice could have resulted from trial counsel's failure to call her because the state-

ment's qualifier, "or something like that," would not have resolved the conflict between the two versions of Mr. Toliver's statement. *Id.* The court did not discuss the remainder of the statements contained in the affidavit.

As to Harvey's statement, the court similarly found that no prejudice resulted from the failure to interview or to call him. Despite noting that "Harvey Toliver's testimony could have established that Oliver had his own reasons for shooting Rogers," the court held that "it would not have reduced Stephen's participation in the homicide." *Id.* at *12 ¶ 48. The court concluded: "For the abundant reasons we have recited, Stephen took several direct and powerful actions that were substantial factors in causing Rogers' death, regardless of the personal animus Oliver may have felt that led him to pull the trigger. Thus, any failure to call Harvey Toliver to testify was not prejudicial." *Id.*

The district court concluded that the Wisconsin appellate court's application of *Strickland* had not been unreasonable. The district court stated: "As the court of appeals previously explained, [Mr. Toliver] did, in fact, take 'several direct and powerful actions that were substantial factors in causing Rogers' death' . . . . Based on the foregoing, this court cannot conclude that the state court's determination that [Mr. Toliver] was not prejudiced by his trial counsel's failure to call Angeal Toliver and Harvey Toliver is contrary to, or an unreasonable application of, clearly established Supreme Court precedent." R.41 at 27 (quoting *Toliver II*, 2001 WL 1084999, at *12 ¶ 48).

**3.**

Mr. Toliver contends that the Court of Appeals of Wisconsin unreasonably applied the *Strickland* standard in rejecting his claim of ineffective assistance of counsel. Mr. Toliver argues that his trial counsel provided ineffective assistance because counsel failed to call Angeal to testify and also failed to interview or call Harvey. Mr. Toliver contends that the testimony of these two witnesses would have aided significantly his defense. Angeal's testimony would have contradicted Foster's trial testimony that Mr. Toliver directed Oliver to shoot Rogers, and Harvey's testimony would have established that Oliver had his own reasons for killing Rogers. Mr. Toliver contends that the Wisconsin court's application of the *Strickland* test was objectively unreasonable.

The State contends that the Wisconsin appellate court reasonably concluded that "Angeal Toliver's testimony would have been inconsequential to Stephen Toliver's trial and that Harvey Toliver's testimony would not have reduced or lessened Stephen's participation in Tina Rogers' killing." Appellee's Br. at 38. It contends that the state court's *Strickland* analysis was "within the range of defensible positions." *Id.* (citing *Mendiola v. Schomig*, 224 F.3d 589, 591 (7th Cir. 2000)).

A state habeas petitioner seeking relief based on a claim of ineffective assistance of counsel faces a substantial burden. Under *Strickland*, a defendant must prove that his lawyer "fell below an objective standard of reasonableness" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* "*Strickland* builds in an element of deference to counsel's choices in conducting the litigation," we have explained, and section 2254(d)(1) "adds a layer of respect for a state court's application of the legal standard." *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997). Thus, under AEDPA, a habeas petitioner must show that the state court's application of *Strickland* was both incorrect and unreasonable—that is, "lying well outside the boundaries of permissible differences of opinion." *Raygoza v. Hulick*, 474 F.3d 958, 963 (7th Cir. 2007) (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)).

We turn to Mr. Toliver's argument that his trial counsel fell below an objective standard of reasonableness—the first prong of the *Strickland* test.

**a.**

The Court of Appeals of Wisconsin did not engage in an analysis of the first prong of *Strickland*, which asks whether counsel fell below an objective standard of reasonableness. As a result, federal review of this issue "is not circumscribed by a state court conclusion," and our review is de novo. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

It is well established that trial counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary."

*Strickland*, 466 U.S. at 691; *Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006). After conducting an investigation (or making a reasonable decision that investigation is unnecessary), counsel may make a legitimate strategic decision not to call a witness if he makes a determination "that the testimony the witness[] would give might on balance harm rather than help the defendant.*" Foster v. Schomig*, 223 F.3d 626, 631 (7th Cir. 2000) (quoting *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997)).

At this point in the litigation, the State's position is that the state courts were correct in determining that the second prong of the *Strickland* test had not been met because the requisite degree of prejudice had not been shown. Therefore, it does not address whether the performance of Mr. Toliver's counsel was constitutionally adequate.

Nothing in the record before us suggests how Angeal Toliver's and Harvey Toliver's testimony could have harmed Mr. Toliver's defense. On this record, the only reason that we can discern for not calling Angeal and Harvey was their relationship with Mr. Toliver and the resulting possibility of bias. Harvey is Mr. Toliver's cousin and Angeal is his wife and the mother of his children. Consequently, the jury might have dismissed their testimony. Nevertheless, given the nature of Mr. Toliver's defense, which we discuss in more detail below, and the probative and corroborative testimony that Angeal and Harvey would have provided, these witnesses' possible bias does not provide a basis for counsel's failure to call them. *See, e.g.*, *United States ex rel. Hampton v. Leibach*,

347 F.3d 219, 249-50 (7th Cir. 2003) (noting, in a case in which eyewitness testimony was critical, that bias "certainly is a circumstance that a factfinder would consider in weighing [the witness'] credibility, but it is not so impeaching that one can wholly discount the import of their testimony and the effect that it might have had on [a] jury"). Even more fundamentally, counsel could not have made a reasonable strategic decision not to call Harvey without interviewing him in order to evaluate his proposed testimony, his credibility or his demeanor. *See Davis v. Lambert*, 388 F.3d 1052, 1063-64 (7th Cir. 2004); *Washington v. Smith*, 219 F.3d 620, 629-30 (7th Cir. 2000); *see also Strickland*, 466 U.S. at 691. Angeal's and Harvey's testimony provided unique information, available from no other witnesses, that was corroborative of Mr. Toliver's claim that he had not urged Oliver to kill Rogers but actually had attempted to dissuade him from doing so.

Consequently, on the record as presently constituted, it appears that the performance of Mr. Toliver's trial counsel fell below an objective standard of reasonableness. As we discuss later, this first prong of the *Strickland* test must be addressed more extensively by the district court on remand.

**b.**

In this case, the Wisconsin appellate court correctly identified *Strickland* as governing the determination of whether Mr. Toliver had received ineffective assistance of counsel. Its analysis of *Strickland*'s prejudice prong, however, fell outside the bounds of objective reasonableness.

In regard to the prejudice that resulted from counsel's failure to call Angeal and to interview and call Harvey, the Court of Appeals of Wisconsin failed to apprehend the nature of Mr. Toliver's defense. It therefore failed to assess how their testimony might have enhanced the possibility of that defense succeeding.

Mr. Toliver does not dispute that he and Oliver armed themselves prior to going out to search for Rogers, that he and Oliver brought her back to the house at Thompson's request or that he was present when Oliver shot Rogers. He does maintain, however, that his role in the events that led to Rogers' murder ought to be characterized differently. More specifically, Mr. Toliver submits that there is limited evidence supporting the conclusion that he directed or encouraged Oliver to shoot Rogers or otherwise intentionally aided and abetted in Oliver's murder of Rogers. He points out that he was the one who pushed away Oliver, his brother and the shooter, when Oliver moved aggressively toward Rogers and that he told Oliver to calm down. Mr. Toliver also attempted, as he portrays the facts, to diffuse the situation by tossing his weapon to Thompson and inviting him to shoot anyone, even Mr. Toliver, who Thompson believed had taken from the stash ("shoot me or whoever you think stole the money," R.30, Ex. 8 at 66). He also claims to have pointed out to Thompson that Rogers' status as a cocaine user did not necessarily make her the thief. Finally, he contends that his exclamation after Oliver shot Rogers was not one of encouragement but of anger or surprise.

The combination of Angeal's and Harvey's testimony no doubt would have enhanced significantly the chances of the jury's accepting Mr. Toliver's characterization of the facts, thereby affording Mr. Toliver a reasonable probability of a different result at trial. *See Stanley*, 465 F.3d at 814; *Goodman v. Bertrad*, 467 F.3d 1022, 1029-30 (7th Cir. 2006) (noting the importance of analyzing the synergistic prejudicial effect of counsel's multiple failings). Had Harvey testified to Oliver's statements that he (Oliver) had shot Rogers because he disliked her and because she had made him angry when she laughed after Commosie had asked her if she had stolen from the stash, the jury would have been able to evaluate more accurately the dynamics of the very fluid and volatile situation in that house, as well as the motivations of the *dramatis personae.* Although the Wisconsin appellate court conceded that "Harvey Toliver's testimony could have established that Oliver had his own reasons for shooting Rogers," it nevertheless concluded that this testimony would have made no difference because Mr. Toliver "took several direct and powerful actions that were substantial factors in causing Rogers' death, regardless of the personal animus that Oliver may have felt that led him to pull the trigger." *Toliver II*, 2001 WL 1084999, at *12 ¶ 48. This brief conclusion significantly understates the importance, for purposes of Mr. Toliver's defense, of establishing that Oliver had an intense dislike for Rogers and therefore his own reasons for shooting her contrary to the wishes of Mr. Toliver. *Cf. Lesko v. Owens*, 881 F.2d 44, 53 (3d Cir. 1989) ("It is generally recognized that evidence of motive may be probative of specific intent."). Indeed, the

Wisconsin appellate court's conclusion wholly ignores Mr. Toliver's defense and the weakness of the State's evidence with respect to whether Mr. Toliver *intentionally* aided and abetted in Rogers' murder.

The Court of Appeals of Wisconsin summarily dismissed Angeal's affidavit because Foster's statement that Mr. Toliver exclaimed "you shot the bitch" was qualified by "or something like that." *Toliver II*, 2001 WL 1084999, at *11 ¶ 47. Angeal's testimony, however, would have served to impeach Foster's trial testimony, which was that Mr. Toliver had said "shoot the bitch." R.30, Ex. 7 at 80. It would have indicated that Foster herself was uncertain about exactly what Mr. Toliver had exclaimed after Oliver shot Rogers.[5] Exactly what Mr. Toliver exclaimed after Oliver fired the first shot is a critical point bearing on his intent, especially given that numerous witnesses, including the State's witnesses, testified that, moments earlier, Mr. Toliver had pushed Oliver away and told him to calm down when Oliver moved aggressively toward Rogers.

---

[5] Angeal's affidavit states that Foster told her that Mr. Toliver "yelled at Oliver you shot the bitch, or something like that." R.30, Ex. 11 at 1-2. The Wisconsin appellate court interpreted the affidavit to mean that Angeal, rather than Foster, added the qualification "or something like that." Whether Angeal correctly remembered what Foster conveyed to her is a matter that the trier of fact nevertheless could have resolved in Mr. Toliver's favor. Moreover, Foster's statement that Mr. Toliver was attempting to take the gun away from Oliver would bolster the argument that Oliver, in fact, did exclaim "you shot the bitch," in surprise or anger.

Two of the State's witnesses, moreover, testified that, from their observations inside the house, they did not believe that either Mr. Toliver or Oliver intended to harm Rogers upon bringing her back to the house. R.30, Ex. 4 at 46-47 (testimony of Thompson) (stating that he thought that Mr. Toliver and Oliver simply were going to scare Rogers for purposes of getting her to tell the truth about who had stolen from the stash); *id.*, Ex. 7 at 102, 107-08 (testimony of Foster) (testifying that she expected that the men were going to have an argument with Rogers about whether she had stolen the money but that she did not expect Rogers to be harmed). This testimony, combined with Angeal's testimony impeaching Foster's testimony incriminating Mr. Toliver, suggests that Mr. Toliver had no intention of aiding and abetting in Rogers' murder and might even suggest that Mr. Toliver was attempting to protect Rogers from Oliver.

Furthermore, the Wisconsin appellate court ignored another extremely probative portion of Angeal's affidavit: that Foster had seen Mr. Toliver attempting to wrestle the gun away from Oliver immediately after Oliver first shot Rogers but before Oliver shot Rogers the second time. This testimony is inconsistent with Foster's testimony at trial in which she indicated that Mr. Toliver simply was standing near Rogers after the first shot. Had the jury heard that Mr. Toliver had attempted to take the gun away from Oliver, it might well have believed Mr. Toliver's testimony that he had exclaimed "you shot the bitch" in surprise or anger. Indeed, the jury also might well have concluded that, when Oliver shot Rogers, he acted not only alone but *against the wishes of Mr. Toliver*.

Accordingly, we believe that the combination of Angeal's and Harvey's testimony could have created a significant doubt as to whether Mr. Toliver, despite his prominence that night, intentionally aided and abetted in the murder of Rogers.

The Wisconsin courts, on direct appeal and on the re-instated direct appeal, consistently have characterized the evidence against Mr. Toliver as overwhelming. The evidence undoubtedly establishes that Mr. Toliver played some role in the events that led to Rogers' murder. To convict him for first-degree intentional homicide, however, the state had the burden of proving that Mr. Toliver *intentionally* aided and abetted in Rogers' murder. On this element, it would be difficult to characterize the State's evidence as anything near "overwhelming." Viewed in this light, counsel's double failure to call Angeal to testify and to interview or call Harvey was prejudicial. Given the weakness of the State's evidence on intent, there is a reasonable probability that, but for counsel's unprofessional errors, the result of Mr. Toliver's trial would have been different. *See Strickland*, 466 U.S. at 694.

We also believe that the Wisconsin appellate court's brief and cursory analysis of *Strickland*'s prejudice prong was not only incorrect, but unreasonable. As we have dis-cussed, the Wisconsin appellate court considered Angeal's and Harvey's testimony in isolation, and it failed to evaluate Angeal's and Harvey's testimony in light of Mr. Toliver's defense and the nature of the State's case against him. *See Hampton*, 347 F.3d at 256-57 (concluding that a state court's application of *Strickland*'s prejudice prong

was unreasonable because the State court had "turned a blind eye . . . to the nature of the State's case"). Although the appellate court recognized that Harvey's testimony would have affected the jury's evaluation of Oliver's motivation in shooting Rogers, the court failed to consider the implications of this observation within the context of Mr. Toliver's defense as well as the weakness of the State's evidence with respect to whether Mr. Toliver *intentionally* aided and abetted in Rogers' murder.

### C. *Brady* Claim

Mr. Toliver submits that he was deprived of his right to due process of law when the Wisconsin court failed to grant him a new trial in light of the prosecutor's failure to disclose to him the Cornell Smith letter that the prosecutor allegedly had received prior to Mr. Toliver's trial. In the affidavit submitted with Mr. Toliver's post-conviction motion, Smith alleged that he had written a letter to Mr. Toliver's prosecutor dated June 10, 1991. In this letter, Smith had asked the prosecutor to speak with another prosecutor in another county in support of Smith's attempt to obtain favorable treatment with respect to charges then pending against him in that county. In return, Smith offered to testify in the pending proceedings against Mr. Toliver and to relate the substance of a telephone conversation in which Thompson and Henry had related their versions of the events that ended with the death of Tina Rogers.

After summarizing the substance of Smith's affidavit and the decisions of the Wisconsin appellate court and the district court, we shall turn to Mr. Toliver's arguments.

**1.**

According to Smith's affidavit, during that telephone conversation, Thompson related that he had thought that Rogers had stolen some of his money and cocaine. Because of this suspicion, the affidavit continued, Mr. Toliver and others had tracked down Rogers and brought her back to the house. Once back at the house, Thompson asked Rogers why she had stolen from his stash. Rogers replied by laughing. At that point, Oliver became angry over Rogers' reaction to the accusation and attempted to take hostile action against her. Mr. Toliver, however, "pushed" him back and told him to "back off or chill out." R.30, Ex. 9 at 2. Smith's affidavit continues by relating that Thompson told him that Oliver did not like Rogers because she was usually high on cocaine and had denied Oliver's sexual advances. Henry confirmed Thompson's statements, the affidavit asserts, by yelling in the background.

Smith's affidavit continues by recounting that, after describing Oliver's burst of anger toward Rogers, Thompson further described how Mr. Toliver had told him that Rogers did not steal from the stash even though she was an addict. After these statements in defense of Rogers, Mr. Toliver threw his weapon to Thompson and told him to shoot whomever he believed had taken from the stash ("shoot me or whoever you think stole it," *id*.). All of a sudden, there was a shot, not from Mr. Toliver's weapon but from Oliver's gun. Mr. Toliver then "grabbed at Oliver" and yelled: "You killed the bitch." *Id.* Thompson, along with others, ran from the house.

Henry then got back on the phone, recounts the affidavit. Smith asked him why Mr. Toliver had been charged if

Oliver had done the shooting. Henry replied that the prosecutor wanted to prosecute both Mr. Toliver and his brother Oliver for the shooting and that Smith and Henry had been told that they would be charged with murder if they did not cooperate. The day after the shooting, Thompson had spoken with his mother who told him to keep quiet.

The affidavit concluded by recounting that the prosecutor had replied to Smith's letter; the prosecutor had stated that he could not help Smith with respect to his prosecution in another county and that Smith's information did not shed any new light on the pending case against Mr. Toliver.

**2.**

The Court of Appeals of Wisconsin acknowledged that the "suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Toliver II*, 2001 WL 1084999, at *9 ¶ 38 (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). The appellate court also acknowledged that this duty applies to impeachment, as well as exculpatory, evidence. *Id.* (citing *Stickler v. Greene*, 527 U.S. 263, 280 (1999)). Finally, the court noted that such evidence is material only if there is "a reasonable probability that, had the evidence been available to the defense, the result in the proceedings would have been different." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

The court then turned to the possible effect of the disclosure of this evidence on Mr. Toliver's trial. The court took the view that the disclosure would not have affected the outcome. Notably, the court conceded that, assuming that the letter actually had been sent and Smith testified in accordance with his affidavit,[6] "his statements conceivably could have affected the jury's view of the persons Smith named, their motives for testifying, and Oliver's reasons for shooting Rogers." *Id.* at *10 ¶ 39. Nevertheless, continued the court, the testimony would not have influenced the jury's view of Mr. Toliver's involvement in the homicide. In the appellate court's view, the facts overwhelmingly established Mr. Toliver's guilt, "indeed his leadership, for this savage murder." *Id.* at *4 ¶ 16. According to the court, Mr. Toliver was involved in the murder of Rogers from start to finish:

> Stephen responded to Thompson's page. Stephen enlisted Oliver's assistance. Stephen and Oliver armed themselves and brought Rogers back to Thompson. Stephen directed Thompson to shoot whomever Thompson believed had taken the drug money. The fact that Oliver, not Thompson, shot Rogers in no way reduces Stephen's complicity in Oliver's intentional act of killing her.

---

[6] Although the Wisconsin appellate court noted that the State had denied that the prosecutor ever had received Smith's letter, it did not rest its ruling on that basis. *Toliver II*, 2001 WL 1084999, at *8-10 ¶¶ 33-39 & n.10. Instead, the appellate court assumed that the letter had been received by the prosecutor and disposed of Mr. Toliver's argument on the merits.

Thus, our fresh review of this case returns us to our earlier conclusion: Although Oliver immediately caused Rogers' death, it was Stephen who intentionally directed it and assisted in it. Therefore, the jury could have had "no reasonable doubt as to the requisite intent" of either Stephen or his brother.

*Id.* at *5 ¶ 17 (internal quotation marks and citation omitted).

After summarizing the decision of the Wisconsin appellate court, the district court held that it could not "conclude that the state court's determination that the suppressed evidence was not material is contrary to, or an unreasonable application of, clearly established Supreme Court precedent." R.41 at 20. The state court had determined that "Mr. Smith's testimony possibly would have affected the jury's views of the persons Mr. Smith named, their motives for testifying, and Oliver's reasons for shooting Ms. Rogers," but the court nevertheless concluded that the result of the proceeding would not have been different. *Id.* The district court explained, therefore, that it "could not conclude that the state court's determination" was unreasonable. *Id.*

**3.**

Mr. Toliver contends that the Wisconsin appellate court unreasonably applied clearly established Supreme Court precedent when it determined that the information contained in Smith's letter did not constitute material, exculpatory evidence. To establish a *Brady* violation, a

defendant must demonstrate that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material to an issue at trial. *United States v. Walton*, 217 F.3d 443, 450 (7th Cir. 2000). The materiality element of *Brady* does not require a demonstration that "disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal" but only that there is a "reasonable probability" of a different result. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

There is little doubt that, had the disputed evidence been admitted, it would have been reasonable for the jury to conclude as the Court of Appeals of Wisconsin believed that it would. With great respect, however, we believe that it is not reasonable to conclude that such a result was the *only* result or even the probable result that the jury would have reached. Again, we believe that our colleagues on the Court of Appeals of Wisconsin failed to apprehend the nature of Mr. Toliver's defense and failed to assess how the evidence in question might have enhanced the possibility of that defense succeeding. *See Kyles*, 514 U.S. at 441-54 (conducting a thorough examination of suppressed *Brady* evidence, what purpose the evidence would have served and how it might have affected the jury's view of the evidence that was introduced); *see also Boss v. Pierce,* 263 F.3d 734, 745 (7th Cir. 2001) (holding that a state court unreasonably fails to apply *Kyles*, 514 U.S. 419, when it fails to "undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial"); *Bailey v. Rae*, 339 F.3d 1107, 1118 (9th Cir. 2003).

As we discussed in analyzing Mr. Toliver's ineffective assistance of counsel claim, Mr. Toliver does not dispute that he and Oliver armed themselves and brought Rogers back to the house at Thompson's request; nor does he dispute that he was present when Oliver shot Rogers. He does submit, however, that his role in the events that led to Rogers' murder ought to be characterized differently. According to Mr. Toliver, there is evidence that he *did not* direct or encourage Oliver to shoot Rogers or otherwise intentionally aid and abet in Rogers' murder. Mr. Toliver notes that many witnesses, including many of the State's witnesses, testified that he was the one who pushed away Oliver, his brother and the shooter, when Oliver moved aggressively toward Rogers and that he told Oliver to calm down. Additionally, two of the State's witnesses testified that, from their observations inside the house, they did not believe that either Mr. Toliver or Oliver intended to harm Rogers upon bringing her back to the house. R.30, Ex. 4 at 47 (testimony of Thompson); *id.*, Ex. 7 at 102, 106-07 (testimony of Foster). Mr. Toliver also claims to have pointed out to Thompson that Rogers' status as a cocaine user did not necessarily make her the thief. Finally, Mr. Toliver contends that his exclamation after Oliver shot Rogers was not one of encouragement but of anger or surprise.

We believe that the disputed evidence would have bolstered Mr. Toliver's defense and therefore would have enhanced significantly the chances of the jury's accepting Mr. Toliver's characterization of the facts. *See Kyles*, 514 U.S. at 434. Because Thompson's account, as related in Smith's affidavit, would not have squared

with his account at trial, the jury would have been able to evaluate more accurately Thompson's recollection of, and the truthfulness of his testimony regarding, Mr. Toliver's involvement in the Rogers murder. At trial, Thompson testified that, although Mr. Toliver had pushed Oliver away when Oliver moved aggressively toward Rogers, he did not tell Oliver to calm down. Thompson also testified that, after Oliver shot Rogers for the first time, Mr. Toliver had not attempted to prevent Oliver from shooting her again but rather he exclaimed, "kill that bitch, kill her." R.30, Ex. 4 at 36. Smith, however, claims that Thompson had admitted that Mr. Toliver actually had "grabbed at" Oliver to prevent him from shooting Rogers again—testimony that could have been corroborated, had Mr. Toliver's counsel called Angeal to testify[7]—and yelled, "you killed that bitch," in surprise. *Id.*, Ex. 9 at 2. Additionally, during Thompson's trial testimony, the jury was apprised that Thompson had not been charged with any drug offenses based on the statements that he had made to the police in conjunction with the Rogers murder. The Smith affidavit hints at the existence of an arrangement, whereby the prosecutor had promised immunity to Thompson in exchange for his cooperation. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (finding a due process violation where the prosecution failed to disclose evidence of a key witness' "agreement as to a future prosecution" because such an agreement would have been relevant to the witness' credibility and "the jury was entitled to know of it").

---

[7]  *See supra* part B.3.

The disputed evidence might well have created a reasonable doubt as to whether Mr. Toliver, despite his prominence that night, intentionally aided and abetted in the murder of Rogers or attempted to prevent it. As with its analysis of prejudice for purposes of Mr. Toliver's ineffective assistance of counsel claim, the Wisconsin appellate court's analysis of the materiality of the Smith letter was unreasonable. The court did not "carefully assess[] what purposes the suppressed evidence might have served and how that evidence might have affected the jury's consideration of the evidence that was introduced." *Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001) (noting the importance of, and holding as material under *Brady* and *Kyles*, evidence bearing on credibility where witness testimony was crucial and the "evidence presented by the state was not overwhelming"). It merely recited, in a rote manner, the evidence that the State had introduced and concluded, based on that evidence, that the exculpatory evidence would not have been material. Had the evidence in the Smith affidavit been presented to the jury, however, it might well have concluded that, when Oliver shot Rogers, he acted not only alone but against the wishes of Mr. Toliver. Consequently, we believe that the disputed evidence may "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

**Conclusion**

The Wisconsin appellate court's determination that the evidence contained in the affidavits of Harvey Toliver

and Angeal Toliver had not prejudiced Mr. Toliver's defense was an unreasonable application of clearly established Supreme Court precedent. Additionally, the evidence contained in the Smith letter, if it actually was received by the prosecutor, constitutes material, exculpatory evidence that the State was required to disclose to Mr. Toliver's defense. The district court therefore committed error in denying the writ on the ground that these determinations by the state court were reasonable.

The state courts never resolved, under the first prong of the *Strickland* analysis, whether Mr. Toliver's counsel was ineffective in not interviewing Harvey and in not calling Angeal. Therefore, issues of fact concerning counsel's competence were never resolved. Similarly, the state courts never resolved whether the prosecutor had received the letter allegedly sent by Smith. On remand, the district court should resolve these issues. On the basis of its findings, the court then should determine whether the writ ought to be granted.

Accordingly, the judgment of the district court is reversed, and the case is remanded to the district court for proceedings consistent with this opinion.

REVERSED and REMANDED

8-27-08