In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2243

MICHAEL CARTER,

*Petitioner-Appellant,*

*v.*

STEPHEN DUNCAN, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:10-cv-03783 — **Harry D. Leinenweber**, *Judge.*

ARGUED APRIL 21, 2015 — DECIDED MARCH 30, 2016

Before EASTERBROOK and RIPPLE, *Circuit Judges*, and
REAGAN, *District Judge.**

RIPPLE, *Circuit Judge*. On September 12, 1999, Friday Gardner was shot to death in front of an apartment building on the south side of Chicago. The State of Illinois charged three men, including Michael Carter, with Gardner's murder. Mr. Carter

---

* The Honorable Michael J. Reagan, of the United States District Court for the Southern District of Illinois, sitting by designation.

was tried alongside his brother, Michael Stone, in a single trial. Both were convicted of murder; Mr. Carter was sentenced to thirty years' imprisonment. Following an unsuccessful state postconviction proceeding, Mr. Carter filed a pro se petition for habeas corpus in the district court under 28 U.S.C. § 2254. The district court denied relief on each of the eight grounds presented in his petition and also denied a certificate of appealability, *see* 28 U.S.C. § 2253(c). We granted a certificate as to a single claim—whether Mr. Carter received effective assistance of counsel. We also appointed appellate counsel.

Mr. Carter brings to us an ineffective assistance claim. His claim turns on the potential effect of the testimony of two witnesses who were not called in his defense at trial. The Illinois Appellate Court determined that the proffered testimony would not have changed the outcome of the trial. Although the state court's analysis stumbles in some respects, we nevertheless must conclude that its decision was not unreasonable. Accordingly, given our deferential standard of review, we affirm the district court's judgment denying habeas relief to Mr. Carter.

# I

## BACKGROUND

### A.

Gardner was murdered in the course of a heated argument about the robbery of an apartment occupied by Stone and other of Mr. Carter's relatives. Mr. Carter and Stone believed Gardner to have been responsible.

At the time of Gardner's murder, Mr. Carter and Gardner each had relatives living on the second floor of a building at 61st and May in Chicago. In one apartment, Gardner's cousin, Antonio Phillips, lived with his mother, Rena Phillips, and her other children. Stone lived next door, in an apartment he shared with his cousin (and Mr. Carter's cousin) Felicia Anderson, her fiancé, Corey Grant, and their children. Both Gardner and Mr. Carter—neither of whom lived in the building—at times visited their relatives there.

On the afternoon of September 12, 1999, the events culminating in Gardner's murder later that night began to unfold: a robbery, a search for the robber, a larceny in retaliation, and, eventually, a heated argument about the robbery that ended in gunfire. First, two men broke into the apartment occupied by Mr. Carter's relatives and robbed Grant at gunpoint. The robbers took money, jewelry, and marijuana packaged for sale. Grant was not alone at the time of the robbery; another of Mr. Carter and Stone's cousins, Michella Anderson, was present, as were others, although the apartment's other occupants, Felicia Anderson and Stone, were not. One of the robbers had a gun, and, while no one was shot, Grant was struck with a baseball bat on his head in the course of the robbery. After the perpetrators fled, Grant ran next door and began pounding on the door and shouting about the robbery. Antonio Phillips emerged with Gardner, who was visiting at the time, and, according to eyewitnesses, both joined the unsuccessful effort by Grant and Michella Anderson to chase down the robbers.

Later, Stone and Felicia Anderson returned home, accompanied by Felicia's sister, LaTonya Cheeks. At some point after learning of the robbery, Stone called Mr. Carter for help in

determining the identity of the robbers. Mr. Carter came to the building with a friend, Cortez Jones. Jones stated that he had heard from a friend that Gardner had been selling packaged marijuana at another location and bragging about robbing someone at 61st and May. Grant, the robbery victim, denied Gardner's involvement, stating that Gardner in fact had tried to chase down the assailants with him. Grant was unable to convince Stone, Cortez, and Mr. Carter. At some point during the day, Stone acquired a gun and stashed it in a locked basement storage area in the apartment building.

According to witnesses at Mr. Carter's murder trial, later that evening, Mr. Carter, Stone, and Jones broke into Gardner's van, which was parked outside the apartment building, stole his radio, and left. Gardner saw them through a window and yelled at them to stop and that he had nothing to do with the earlier robbery. Gardner called his friend, Tommy Gaston, who arrived sometime later. Gaston and Gardner met downstairs and went to the van, where they observed that the radio had been stolen. Gardner's relative, Rena Phillips, and her boyfriend, Paul Calmese, arrived and began talking with Gardner and Gaston outside.

While Gardner and the others were still outside, Mr. Carter and Jones returned, and a heated argument ensued. Stone witnessed the beginning of the exchange from upstairs and went to retrieve the gun from the storage space. Now armed, he emerged from the adjacent alley and headed towards the argument on the street. In the ensuing minutes, Gardner was shot fatally, struck by two bullets in the abdomen. Stone, Jones, and Mr. Carter all fled the scene.

Police officers patrolling the area were in close enough proximity to view flashes and hear gunshots. Officer

Cedric Taylor ran to the scene, arriving within seconds. He attempted to chase the assailants but lost sight of them and returned to the scene. Officers immediately began taking statements from the numerous eyewitnesses.

**B.**

The State charged Mr. Carter, Stone, and Jones with the murder of Gardner. In 2002, Mr. Carter and Stone proceeded to trial together, represented by separate counsel. Jones was tried in a separate proceeding.

In Mr. Carter and Stone's trial, the State's theory was that two sets of shots were fired: an initial set by Stone and a second set from *either* Jones or Mr. Carter. It argued that all of the defendants were armed and that they fled after the fatal shots were fired and discarded their weapons. The State told the jury that, under an accountability theory, it was irrelevant which individual actually had fired the fatal shots.

Stone admitted to shooting Gardner and presented both self-defense and defense of others as a justification. Stone contended that he had seen Gardner point a gun, or attempt to point a gun, at Mr. Carter, and that only then did Stone fire. Mr. Carter argued that he was unarmed and was not responsible for the actions of Stone or Jones.

The eyewitness statements, both to the police and at trial, varied widely, and several witnesses testified inconsistently with their prior statements to law enforcement in the days following Gardner's murder. Based on those initial statements given to police and testimony before the grand jury, the State assembled a witness list to support its case, consisting of law

enforcement officers, Lenisha Pearson (Gardner's then-girl-friend), Grant, Felicia Anderson, Rena and Antonio Phillips, and Cheeks.[1]

Except for the officers, each of the witnesses who testified at trial had some preexisting relationship either to Gardner or to the alleged perpetrators. The first group had a relationship to the victim, Gardner. At trial, Gardner's relatives, Rena and Antonio Phillips, testified that the shots fired at Gardner came from the direction of Mr. Carter and Jones, not Stone. Both testified that they saw Jones fire shots first, and both testified that they saw Mr. Carter with a gun. Rena Phillips testified that she saw Mr. Carter shoot as well. Antonio Phillips testified that by the time the second set of shots were fired, he was running toward the scene from his prior vantage point. Both testified that they saw Mr. Carter and Jones flee. Neither witness said anything about Stone. Pearson, Gardner's then-girl-friend, testified that she had heard two sets of shots, the first of which came from Stone, and the second of which came from either Mr. Carter or Jones. She also testified that she saw Gardner throughout the exchange and that he did not have a gun. Gaston, a friend of Gardner's, testified that he heard, but did not see, an initial shot. He then saw Jones pull a gun from his pocket and shoot at Gardner four times, these shots being louder than the initial single shot. He testified that he then saw Mr. Carter and Jones flee. He did not see Gardner with a gun that night.

---

[1] Mr. Carter's former girlfriend, Sharon Triplett, also testified, but was called only for the purpose of identifying his vehicle.

The second set of State's witnesses were Mr. Carter's relatives and friends—Felicia Anderson, Grant and Cheeks. Although their testimony was part of the State's case-in-chief, it was more problematic for the prosecution. Felicia Anderson, Mr. Carter's cousin, testified that she did not see the shooting, but that she did see Gardner with a gun and also saw Gaston remove it from the scene. She was impeached, however, with her prior signed statement to police and her grand jury testimony. In those earlier statements, she had said that she was standing near the shooting, heard shots, turned to face the scene, and witnessed Mr. Carter pointing a gun at Gardner. She left the scene shouting that Mr. Carter had "shot him."[2] At trial, she attempted to explain these discrepancies by claiming that her earlier statements were based on what others had told her rather than what she personally had observed.

Grant, Felicia's fiancé, claimed to have been inside the apartment during the shooting. Grant testified only that he saw people running from the scene after hearing shots. He stated on cross-examination that he had seen Gardner with a gun earlier in the day when he had tried to chase down the people who had robbed Grant.

Cheeks, Felicia's sister, also testified at trial that she saw Gardner pull a gun and point it at Mr. Carter and that Stone shot in defense. She later contradicted that testimony and stated that she had seen Gardner point his gun in the air rather than at Mr. Carter. Also, Cheeks initially claimed that only Stone shot at Gardner, but on cross she stated that she heard shots from the area where Jones and Mr. Carter were

[2] R.14-7 at 91.

standing. Her prior signed statement and grand jury testimony were published to the jury. In them, Cheeks stated that she did not see anything in Gardner's hands, that Stone had shot first and fired three times, and that a fourth shot was fired by either Jones or Mr. Carter.

The physical evidence presented at trial showed that Gardner was shot twice with .380 caliber bullets, and the parties stipulated that they had been fired from the same gun. Three .380 cartridge casings were also recovered from the scene within a few feet of the blood stain from Gardner's body, but it could not be determined if they were from the same weapon that killed Gardner. No other evidence linked the bullets or the casings to any particular defendant. More than one witness, including a police officer stationed nearby who heard the shots, testified that there was an initial set of shots and a second set, and the two sounded somewhat different. Gardner's autopsy report showed no evidence of close-range firing, although multiple witnesses had stated that Jones and Mr. Carter were within a few feet of Gardner at the time of his murder.

The attorneys representing Stone and Mr. Carter, respectively, called only two defense witnesses: Michella Anderson, a cousin of Stone and Mr. Carter, and Stone himself. Michella Anderson testified that she saw Gardner pull a gun and point it in the air. A shooter, whom she could not identify, entered from the alley and fired. She also testified that, after Gardner was shot, Gaston retrieved Gardner's gun, put it in his car, and drove away. Unlike Felicia Anderson and Cheeks, Michella Anderson had not made a statement to the police immediately after the incident and was not called to appear before the grand jury. She did testify that she had met with

attorneys for the State and for the defendants at various points during the investigation and had informed each of them that she had seen Gardner with a gun.

Stone testified that he alone shot Gardner and that he did so only after Gardner pointed a gun at Mr. Carter. He claimed that he was the only shooter and that he never saw Mr. Carter with a gun that evening. Mr. Carter did not testify.

In closing arguments, Stone's attorney focused on his self-defense theory and relied in significant measure on Michella's testimony that Gardner, the victim, was visibly armed. Mr. Carter's attorney focused on the lack of evidence of any close-range firing and the evidence that Mr. Carter was within a few feet of Gardner at the time of the shooting. He contended that the evidence could support that Jones and Stone had fired their weapons, but that there had been no evidence that Mr. Carter knew that Jones was armed or that Stone was there at all. The State's attorney countered that it did not matter who did the shooting because the evidence demonstrated that all three men were armed. Further, the State noted that Mr. Carter was responsible for bringing Jones to the scene, and, following the shooting, Mr. Carter, Stone, and Jones fled the scene while the other witnesses remained.

The jury found both Stone and Mr. Carter guilty of first-degree murder. Jones also was convicted of first-degree murder in a separate proceeding. Each was sentenced to thirty years' imprisonment.

Mr. Carter and Stone filed a joint direct appeal alleging multiple points of error, including that trial counsel was ineffective for failing to preserve objections to evidence about the

marijuana stolen from the home or to otherwise request a limiting instruction, as well as other claims not relevant to the present petition. No other ineffective assistance claims were raised. In the course of affirming the trial court's judgment, the Appellate Court of Illinois noted "that the evidence in this case was not closely balanced."[3] The Illinois Supreme Court denied leave to appeal.

## C.

In 2005, Mr. Carter and Stone filed a joint pro se petition for postconviction relief in the Circuit Court of Cook County. In the petition, they asserted that trial and appellate counsel had been ineffective. They contended specifically that trial counsel had been ineffective for failing to call two additional witnesses, Jeremiah McReynolds and Paul Calmese, failing to impeach certain witnesses, and emphasizing Stone's self-defense theory over Mr. Carter's mere presence theory. They further contended that counsel had failed to present available evidence to support the claim of self-defense. Finally, they claimed that appellate counsel was ineffective for failing to raise the ineffective assistance claims based on trial counsel's performance.

Attached to the petition were several affidavits, including one from McReynolds. McReynolds stated that he also lived at 61st and May and that, on the night of the murder, had heard a commotion, looked outside, and observed the argument across the street. During the argument, McReynolds

---

[3] R.14-1 at 9.

"observed Friday Gardner pull an object out from behind his back and then…heard several shots ring out from the alley-way."[4] He identified the shooter as "Man," a nickname trial witnesses had indicated belonged to Stone.[5] McReynolds stated that he "did not personally observe anyone else doing any shooting," and that he observed Mr. Carter and Jones "scatter in an effort to avoid being shot."[6] He indicated that he had shared his account with Cheeks and offered to testify and that he eventually learned that he had been placed on Mr. Carter's witness list. McReynolds's affidavit concluded: "Although I was available and in Chicago, Illinois at all times in which the trial was going on, no lawyer or anyone else from the court contacted me or called me as a witness about the facts that happened on September 12, 1999."[7]

In support of the assertion regarding Calmese's probable testimony, Mr. Carter attached a police report to his petition. Following the shooting, Calmese told police that he had been talking with Gardner when Mr. Carter and Jones arrived and the argument began. He saw that Jones had a gun during the argument. He also saw that someone came from the alley and shot at Gardner, and Jones subsequently also shot at Gardner.

The Illinois circuit court denied the petition and a subsequent motion to reconsider. Mr. Carter appealed to the Illinois Appellate Court and was represented by the Office of the

---

[4] R.14-2 at 22.

[5] *Id.*

[6] *Id.*

[7] *Id.*

State Appellate Defender. The State appellate court affirmed.[8]
It reached the merits of Mr. Carter's ineffective assistance ar-
guments and rejected them. It first set forth the familiar two-
prong deficiency-and-prejudice standard under *Strickland v.
Washington*, 466 U.S. 668 (1984), citing both *Strickland* and a
state case, *People v. Coulter*, 815 N.E.2d 899, 905 (Ill. App. Ct.
2004). The court then continued, again citing *Coulter*: "To
show prejudice, defendant must show that counsel's deficient
performance rendered the result of the proceeding unreliable
or fundamentally unfair."[9]

In its analysis, the court skipped the deficiency prong and
stated that "even if trial counsel's failure to call McReynolds
and Calmese to testify fell below an objective standard of rea-
sonableness, defendant's claim fails because he is unable to
show resulting prejudice."[10] The court noted that the evidence
in the case was "not close," and the testimony of McReynolds
and Calmese "would not have been exculpatory and would
have merely been cumulative of the testimony presented by
Felicia Anderson, LaTonya Cheeks, Michell[a] Anderson, and
co-defendant Stone. Defendant's theory of defense," it con-
cluded, "was presented at trial and corroborated where these
witnesses testified that the victim had a gun and defendant
did not."[11] The court further noted that McReynolds's affida-

---

[8] *Id.* at 157.

[9] *Id.* at 168–69.

[10] *Id.* at 169.

[11] *Id.*

vit was "insufficient and unsupportive of defendant's defense" because it did not establish that he was unarmed or uninvolved, only that McReynolds *had not seen* a gun.[12] Finally, the court concluded that "the result of defendant's trial would have been the same even if Calmese and McReynolds had testified that defendant was unarmed where the jury was given" an accountability instruction that focused on whether a defendant "solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."[13] Accordingly, "[a]ny possible testimony from McReynolds and Calmese that defendant was unarmed would not have illuminated whether defendant was legally accountable for the actions of his co-defendants."[14] The court closed by noting that, on direct appeal, it had concluded "that the evidence here was not closely balanced," and that Mr. Carter "is unable to show resulting prejudice where the alleged deficient performance of counsel did not render the proceeding unreliable or fundamentally unfair."[15]

## D.

Mr. Carter next filed a pro se petition for a writ of habeas corpus in federal district court, seeking relief on eight separate grounds. Included among those claims were a free-standing actual innocence claim, claims related to a denial of a fair

---

[12] *Id.* at 169–70.

[13] *Id.* at 170 (internal quotation marks omitted).

[14] *Id.*

[15] *Id.* at 171.

trial, claims related to excessiveness of sentence, and the claim regarding ineffectiveness of trial counsel for failure to call McReynolds and Calmese. The district court determined that all of the claims, save for ineffective assistance, were either procedurally defaulted or not cognizable on federal habeas review and rejected them. Turning to the only non-defaulted, cognizable claim, the court held that Mr. Carter had failed to "overcome the presumption that counsel's decision not to call these witnesses was reasonable."[16] The record made clear that counsel was aware of McReynolds and may have decided not to call him because of his significant criminal record. Counsel may also have decided that the testimony of either witness was duplicative of other testimony, or was "unavailing because Carter was charged under an accountability theory, meaning that he could be found legally accountable for his co-defendant's actions even if he did not fire at Gardner."[17] The court then determined that, even if performance was deficient, Mr. Carter could not demonstrate prejudice because a self-defense theory had been presented to the jury and rejected, and because at least six witnesses had testified that Mr. Carter, Jones, or Stone fired at Gardner, which would support the State's accountability theory. The district court denied relief and denied a certificate of appealability.

We issued a certificate of appealability, limited to the ineffective assistance of counsel claim. We also recruited counsel and specifically directed briefing on trial counsel's failure to call McReynolds and Calmese.

---

[16] R.26 at 21.

[17] *Id.*

## II

## DISCUSSION

Mr. Carter contends that he was denied his Sixth Amendment right to counsel. Specifically, he argues that his trial counsel rendered ineffective assistance by failing to investigate and to call McReynolds and Calmese. He also contends that the Illinois Appellate Court applied an incorrect legal framework to this claim by requiring him to demonstrate that counsel's alleged errors rendered his trial "unreliable or fundamentally unfair." The State counters that the state courts reasonably and appropriately applied the *Strickland* standard. In any event, the State adds, Mr. Carter's claims fail on de novo review. It argues that Mr. Carter waived the portion of his claim relating to a failure to *investigate* McReynolds and Calmese, rather than a failure to call. Finally, it contends that there is no reasonable probability that the outcome of Mr. Carter's trial would have been different with their testimony. We address these issues in turn.

## A.

Our standards of review in this context are complex but familiar. We review the district court's decision denying habeas relief de novo. *Smith v. Gaetz*, 565 F.3d 346, 351 (7th Cir. 2009). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), if a claim "was adjudicated on the merits in State court proceedings," federal review of the conviction is highly circumscribed. 28 U.S.C. § 2254(d). Focusing on the decision of the last state court to address a given claim on the merits, *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991), we ask only whether the state adjudication "resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1)–(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002) ("A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases… .").

When, by contrast, the state court has articulated *properly* the governing legal standard, a petitioner still may succeed by showing that the State's *application* of that standard was "unreasonable." *Williams*, 529 U.S. at 411. Under this standard,

> We may not issue a writ "simply because [we] conclude[]…that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000); *Rastafari v. Anderson*, 278 F.3d 673, 688 (7th Cir. 2002). This demanding standard allows us to issue a writ only in cases "where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court]

precedents. It goes no farther." *Harrington* [*v. Richter*, 562 U.S. 86, 102 (2011)].

*Carter v. Butts*, 760 F.3d 631, 635 (7th Cir. 2014) (alterations in original) (parallel citations omitted).

With these rules in mind, we now turn to Mr. Carter's arguments on the merits.

**B.**

Mr. Carter now raises a single claim of ineffective assistance based on his attorney's failure to investigate and call McReynolds and Calmese to testify at his trial. In his view, both possible witnesses offered testimony in his favor that was unique in substance, quality, or source, i.e., because it came from a witness without a previous tie to Mr. Carter or his associates. In the case of McReynolds, the proffered testimony both came from a totally disinterested witness and undermined the State's case. And unlike the other witnesses who gave testimony favorable to Mr. Carter, McReynolds was not vulnerable to impeachment with prior inconsistent statements to law enforcement. In the case of Calmese, he was connected *to Gardner*, and would have been the only witness so situated who could have corroborated unequivocally Mr. Carter's claims that he was not a shooter.[18]

---

[18] Rena's testimony was equivocal on the shooter issue. She identified Mr. Carter as one of the shooters, but said that she often "mixed up" Mr. Carter and Stone. R.14-6 at 178. Antonio identified Jones as a shooter, but claimed to have seen Mr. Carter with a weapon as well, and stated that additional shots were fired.

The framework of our analysis of Mr. Carter's Sixth Amendment claim is *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*'s familiar two-prong test, we begin with the issue of deficiency, i.e., whether "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and then consider the issue of prejudice, i.e., whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

### 1.

As we already have noted, the state court did not address the deficiency prong of the *Strickland* analysis. Accordingly, "we must 'dispose of the matter as law and justice require,' 28 U.S.C. § 2243, which is essentially de novo review." *Eichwedel v. Chandler*, 696 F.3d 660, 671 (7th Cir. 2012).[19]

We begin with a preliminary issue concerning Mr. Carter's precise contentions on deficient performance. In the current briefing, Mr. Carter repeatedly frames his claim as a claim that his trial counsel's deficiency was a failure to investigate and call the proffered witnesses. In his petition in the district court, however, Mr. Carter principally argued that the failure to *call* the witnesses was counsel's deficient performance. The

---

[19] *See also Thomas v. Clements*, 789 F.3d 760, 766–67 (7th Cir. 2015) (evaluating separately the standards of review applicable to the different prongs of the *Strickland* analysis given the last state court's failure to address deficiency); *Toliver v. McCaughtry*, 539 F.3d 766, 775 (7th Cir. 2008) (applying de novo review to deficiency prong only where applicable state court engaged in no analysis of it).

State seizes on the discrepancy and contends that Mr. Carter has waived any claims relating to counsel's failure to *investigate* these witnesses.[20]

We are not persuaded that Mr. Carter's marginally different characterizations of his claim are consequential. In the first place, Mr. Carter's pro se petition in the district court must be construed liberally. *Bennett v. Gaetz*, 592 F.3d 786, 790 (7th Cir. 2010); *cf. Ward v. Jenkins*, 613 F.3d 692, 696–97 (7th Cir. 2010) (employing a liberal construction to a pro se state petition to determine if claims were fairly presented to state courts). More importantly, however, a review of our substantive standards for evaluating Mr. Carter's failure-to-call claims demonstrates that we have regarded such claims as closely tied to what the record tells us about the nature of counsel's investigation. Specifically, in applying *Strickland*'s first prong generally, we have stated that

> we presume that counsel's actions fall within the wide range of reasonable professional assistance, and defer to *strategic decision-making* by a trial attorney. Despite this weighty deference, we nonetheless must carefully consider whether the attorney brought to bear the skill and knowledge that allows for a proper adversarial testing process, considering all the circumstances.

---

[20] We note that the State does not argue that Mr. Carter *defaulted* a failure-to-investigate claim in the state courts, only that he waived it by failing to present it in the district court. *See* Appellee's Br. 44–45.

*Adams v. Bertrand*, 453 F.3d 428, 434–35 (7th Cir. 2006) (empha-
sis added) (citations omitted) (internal quotation marks omit-
ted). In elucidating this standard in the context of a claim of
failure to present certain potentially favorable testimony, we
have stated:

> "[A] lawyer's decision to call or not to call a wit-
> ness is a strategic decision generally not subject
> to review. The Constitution does not oblige
> counsel to present each and every witness that
> is suggested to him." *United States v. Williams*,
> 106 F.3d 1362, 1367 (7th Cir. 1997) (internal cita-
> tion and quotation marks omitted). If counsel
> has investigated witnesses and consciously de-
> cided not to call them, the decision is probably
> strategic. An outright failure to investigate wit-
> nesses, however, is more likely to be a sign of
> deficient performance. …
>
>       … .
>
>       … . Few decisions not to present testimony
> can be considered "strategic" before some in-
> vestigation has taken place. As we explained in
> *United States ex rel. Hampton v. Leibach*, 347 F.3d
> 219 (7th Cir. 2003), "strategic choices made after
> *less than complete* investigation are reasonable
> precisely to the extent that reasonable profes-
> sional judgments support the limitations on in-
> vestigation."

*United States v. Best*, 426 F.3d 937, 945–46 (7th Cir. 2005) (em-
phasis in original); *see also Mosley v. Atchison*, 689 F.3d 838, 848

(7th Cir. 2012) ("To avoid the inevitable temptation to evaluate a lawyer's performance through the distorting lens of hindsight, *Strickland* establishes a deferential presumption that strategic judgments made by defense counsel are reasonable. But the presumption applies only if the lawyer actually exercised judgment." (citation omitted)). That is, although we defer to *strategic* decisions, we first assure ourselves that a strategic decision was made, because "[t]he consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness." *Mosley*, 689 F.3d at 848. In sum, although "[i]t would be a rare case where counsel's *conscious* decision not to call a witness would amount to constitutionally ineffective assistance," *United States v. Weaver*, 882 F.2d 1128, 1139 (7th Cir. 1989) (emphasis added), "strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (internal quotation marks omitted); *see also Strickland*, 466 U.S. at 691 ("In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

The record does not reveal anything about the scope of counsel's investigation of Calmese and McReynolds. Counsel was aware of both witnesses and initially placed McReynolds on the witness list and took steps to secure his testimony.[21] For reasons that are not disclosed by the record, counsel did not

---

[21] Specifically, the record shows that counsel sought a court order for his testimony when McReynolds was incarcerated in the months before the trial.

actually contact or call either potential witness. On the record before us, therefore, we cannot determine that counsel conducted the investigation necessary to conclude that pursuing McReynolds's or Calmese's testimony would be fruitless.[22]

Potential reasons not to call either witness are, of course, conceivable. McReynolds was incarcerated during the lead-up to Mr. Carter's trial, and counsel may have concluded that his criminal history (the details of which are not part of the present record) were sufficiently problematic that his testimony would have been of little value. Counsel may have believed that the testimony of either witness would have been cumulative and unhelpful, a point we shall examine in our prejudice analysis. On the other hand, we have found deficiency in situations where counsel has failed to call witnesses *even when* testimony is cumulative, if the missing witness is disinterested in a case in which other witnesses have a relationship to the defendant. *See Montgomery v. Petersen*, 846 F.2d

---

[22] The Government cites *United States v. Ashimi*, 932 F.2d 643 (7th Cir. 1991), for the proposition that "a blank record [concerning an attorney's investigation] cuts in favor of, not against, effective assistance." *Id.* at 649. *Ashimi*, however, was a direct appeal, and therefore the defendant had elected to raise an ineffective assistance claim on the trial record itself, a decision that is discouraged in the main of cases because of the limitations on available facts. *See, e.g.*, *United States v. Taglia*, 922 F.2d 413, 417–19 (7th Cir. 1991) (discussing the options for raising an ineffective assistance claim and reminding defendant that "if he wants to support the claim with facts that require evidence to establish he will be well advised to wait till the postconviction stage and will be safe in doing so"). Furthermore, the record as it stands does not resolve the matter for Mr. Carter, but neither is it "blank." We know, for instance, that counsel was aware of McReynolds and his probable testimony, that he initially placed McReynolds on the witness list, but that he did not contact McReynolds and did not call him.

407, 414 (7th Cir. 1988) ("The jury was presented with a straightforward credibility choice. Every one of these witnesses had a reason to be biased. Given the standoff between two factions in this family, one group supporting Wayne Montgomery and the other group supporting the petitioner, independent corroboration by a neutral, disinterested witness would perforce be extremely significant.").

Under these circumstances and considering the *potential* value of the testimony of Calmese and McReynolds—the merits of which we shortly shall examine—it may well have been that "counsel could not have made a reasonable strategic decision not to call [either witness] without interviewing [them] in order to evaluate [their] proposed testimony, [their] credibility or [their] demeanor." *Toliver*, 539 F.3d at 775. Based on the allegations contained in the affidavit of McReynolds, which we must take as true at this stage of the proceeding, such an investigation did not occur. Remand therefore might well be appropriate to address the first *Strickland* prong, unless the claim was properly denied on the prejudice prong. *Cf. id.* at 782 ("The state courts never resolved, under the first prong of the *Strickland* analysis, whether Mr. Toliver's counsel was ineffective in not interviewing Harvey and in not calling Angeal. Therefore, issues of fact concerning counsel's competence were never resolved.").[23] We therefore proceed to the prejudice prong of *Strickland*.

---

[23] One additional point deserves mention: whether a statutory bar stands in the way of Mr. Carter's request for an evidentiary hearing. Specifically, under 28 U.S.C. § 2254(e)(2), "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the [federal] court shall not hold an evidentiary hearing," except in limited circumstances. At oral

**2.**

**a.**

The parties dispute the appropriate standard of review on
the issue of prejudice. The Illinois Appellate Court discussed
and resolved this issue on the merits against Mr. Carter. Or-
dinarily, this state court determination would require us to
apply AEDPA deference to the state court's decision. *See* 28
U.S.C. § 2254(d)(2); *supra* section II.A. Mr. Carter, neverthe-
less, contends that our review of the prejudice prong is also

argument, we questioned the parties about whether such a request had
been presented to the state court, and, if not, whether the lack of such a
request barred federal courts from the consideration of extra-record mate-
rial and prevented us from remanding the case for an evidentiary hearing.
We requested supplemental briefing on the topic.

Both parties responded that, under the Illinois Post-Conviction Hear-
ing Act, 725 ILCS 5/122-1 *et seq.*, Mr. Carter's filing of the petition itself
effectively requested a hearing, and one would have been granted as a
matter of course had the petition advanced beyond the early screening
stages. *See* App. R.54; App. R.53 at 1 ("[A]n evidentiary hearing is required
whenever petitioner satisfies the second-stage standard." (citing *People v.
Coleman*, 701 N.E.2d 1063, 1072 (Ill. 1998)). We are somewhat skeptical of
the breadth of this legal conclusion—the state court surely would not
grant an evidentiary hearing if the parties agreed on the factual basis of
the claim. Nevertheless, the Supreme Court has interpreted the bar in
§ 2254(e)(2) as requiring a showing of "some lack of diligence" on the part
of the petitioner. *Williams v. Taylor*, 529 U.S. 420, 430 (2000). Here, the State
essentially concedes that Mr. Carter acted in the manner envisioned by the
state postconviction procedure with respect to this issue. *See id.* at 437
("Diligence will require in the usual case that the prisoner, at a minimum,
seek an evidentiary hearing in state court *in the manner prescribed by state
law*." (emphasis added)). We therefore do not believe that § 2254(e)(2)
stands as a bar to our consideration of his request for a hearing in federal
court.

de novo, because the state court analyzed the case under *People v. Coulter*, 815 N.E.2d 899 (Ill. App. Ct. 2004), a case which stated that outcome-determinative prejudice is insufficient unless counsel's performance resulted in a trial that was unreliable or fundamentally unfair.

At first blush, Mr. Carter's point is well taken, and one that we have noted before. In *Strickland*, the Supreme Court identified the now familiar prejudice standard as whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Mr. Carter is correct that the State court *recited* a standard that placed an additional burden on him, specifically, one that required him to demonstrate not only a reasonable probability of a different outcome, but that the result of counsel's errors rendered his trial unreliable or fundamentally unfair. The state court's actual decision rested, however, on his failure to satisfy even the lower outcome burden under *Strickland*. Put simply, although the state court's decision is bookended by an articulation of the fundamentally-unfair-or-unreliable standard, its analysis is focused on whether the proffered testimony could have affected the outcome, which is the correct inquiry under *Strickland*. *See* R.14-2 at 169–70 (noting that the testimony "would not have been exculpatory" and was "cumulative," that McReynolds' testimony did not accomplish what Mr. Carter alleged that it did, and that, because of the State's accountability theory, "the result of defendant's trial would have been the same").

We faced a similar situation in *Floyd v. Hanks*, 364 F.3d 847 (7th Cir. 2004). There, the Court of Appeals of Indiana examined prejudice under *Strickland* but recited that "when errors

do not make the result of the trial unreliable, they do not cause prejudice." *Id.* at 852. Nevertheless, we noted that

> a fuller view of the appellate court's discussion reveals that while the term "reliability" was employed, the actual analysis of Floyd's counsel's conduct properly considered whether the counsel's actions affected the outcome of the trial. As noted above, the Indiana Appellate Court considered the potential effect of the [favorable evidence] against the weight of the other evidence heard by the jury. In reaching its decision that there was no prejudice, the court found that the inculpating evidence was overwhelming and had Floyd's counsel taken the steps that Floyd now demands, the result would have been the same; this is the very analysis that is required by *Strickland* and *Williams*.

*Id.* at 852–53 (footnote omitted); *cf. Goodman v. Bertrand*, 467 F.3d 1022, 1028 (7th Cir. 2006) (finding state court applied an incorrect prejudice analysis where "it repeatedly reasoned that Goodman failed to show that his second trial was 'fundamentally unfair' or 'unreliable'").

The analysis in *Floyd* applies here. Even though the Illinois court noted that counsel's performance "did not render the proceeding unreliable or fundamentally unfair,"[24] its analysis focused on the probable impact of the proffered testimony on the outcome. The court evaluated the evidence piece by piece and concluded explicitly that, because the jury was instructed

---

[24] R.14-2 at 171.

on an accountability theory, "the result of defendant's trial would have been the same even if Calmese and McReynolds had testified that defendant was unarmed."[25] "Any possible testimony from McReynolds and Calmese that defendant was unarmed would not have illuminated whether defendant was legally accountable for the actions of his co-defendants."[26] This is precisely the analysis demanded by *Strickland*. Accordingly, the Illinois court's analysis is not "contrary to" settled law, and we therefore apply AEDPA deference to the state court's resolution of the issue.

We next turn to the question whether the State unreasonably applied *Strickland* on the facts before it. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Specifically, we must determine whether the state court's assessment of the probable value of the proffered testimony was unreasonable.[27]

---

[25] *Id.* at 170.

[26] *Id.*

[27] In evaluating the prejudice prong, both parties invite our attention to the results of an entirely separate state court conviction and federal habeas proceeding: those involving Cortez Jones. Jones, like Mr. Carter, was convicted of the murder of Gardner, although in a separate trial. Mr. Carter emphasizes that Jones was granted habeas relief on an ineffective assistance of counsel claim by the district court, which also focused on the failure to present exculpatory testimony. *See United States ex rel. Jones v. Jackson*, No. 08 C 4429, 2014 WL 4783810 (N.D. Ill. Sept. 25, 2014). The State emphasizes that the testimony actually presented at Jones's hearing undermines Mr. Carter's claims. In evaluating these arguments, we note first that the grant of relief by a district court to Jones, which has now been

We begin with Calmese. If he had testified consistently with his statement to police, Calmese would have stated that Stone fired first, and then Jones fired.[28] He made no statement

---

appealed and is pending before another panel of this court, is not factually similar. Specifically, it has nothing to do with the testimony of McReynolds and Calmese on which Mr. Carter bases his claim, but was instead focused on Jones's trial attorney's failure to call *Stone*, who claimed to be the sole shooter and who disavowed cooperation with Jones and Mr. Carter. Second, and most importantly, as we already have noted, our review is limited to the record as it existed in state court. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). We therefore do not consider the material from Jones's hearing or the court's disposition of his case in our evaluation of Mr. Carter's claim.

[28] The relevant description of Calmese's probable testimony contained in the police report states, in full:

> Paul CALMESE …………………… stated that he was on the street standing next to the victim. CALMESE stated that he had been called by the victim because someone had stolen his car radio. CALMESE stated that as they were talking the Cav[alier] pulled up, and two guys got out. CALMESE stated that the driver went and started talking to Friday. CALMESE stated that they began to argue, and Friday is asking for his radio back. CALMESE stated that he observed that the passenger of the Cav[alier] had a gun in his pocket. CALMESE stated that the driver then accused Friday of burglarizing his relatives['] apartment. CALMESE stated that he stepped behind the passenger. CALMESE stated that someone came out of the building, (6102 S. May), and was standing by the alley. CALMESE stated that the subject came from the alley, stepped between him and the driver of the vehicle, and fired three times. CALMESE stated that the passenger then fired twice at the victim. CALMESE stated that after

about Mr. Carter's possession or use of a weapon. It is true that, unlike the testimony of Rena and Antonio Phillips, Calmese's testimony would not have inculpated *directly* Mr. Carter. And unlike Pearson (who indicated that Stone shot and *either* Jones or Mr. Carter followed) and Gaston (who identified Jones as a shooter and was unclear if anyone else shot), Calmese's two-shooter scenario involves only Stone and Jones. It is perhaps most consistent with Cheeks's testimony that Stone shot and then additional shots came from the direction of Mr. Carter and Jones.

According to his affidavit, McReynolds would have testified that he heard the argument, "observed Friday Gardner

---

the shooting the two subject[s] from the vehicle fled east on foot, and the other subject fled west.

R.14-2 at 24.

pull an object out from behind his back and then…heard several shots ring out."[29] He continues that "[t]he individual firing the shots" was Stone.[30] Further, McReynolds states: "I did

---

[29] *Id.* at 22. McReynolds's affidavit states, in full:

> I, Jeremiah McReynolds[,] being first deposed upon his sworn oath under penalty of perjury, do freely and willfully attest to the following facts as being true and accurate to the best of his personal knowledge and belief, to wit:

> 1.        On the 12th of September, 1999 at approximately 11:00 p.m.; I personally observed from my first floor window at 61st and May, three individuals across the street hollering and gesturing at one another in a agitating manner;

> 2.        Such individuals were Junior (Michael Carter), a guy named Cortez Jones, and Friday Gardner. They were all arguing and from time to time they were all seen in the neighborhood;

> 3.        During what appeared to be a very heated argument, I observed Friday Gardner pull an object out from behind his back and then I heard several shots ring out from the alleyway;

> 4.        The individual firing the shots was known to me as "Man" and he lived in the neighborhood;

> 5.        I did not personally observe anyone else doing any shooting, and when the shooting was occurring the reaction of Junior (Michael Carter) and Cortez Jones was to scatter in an effort to avoid being shot;

> 6.        Friday Gardner was shot and he fell to the pavement as everyone around him fled from the scene;

not personally observe anyone else doing any shooting, and when the shooting was occurring the reaction of Junior (Michael Carter) and Cortez Jones was to scatter in an effort to avoid being shot."[31] If he had been called to testify, therefore, McReynolds would have echoed the testimony of Felicia and

---

7.  I later informed LaTonya Cheeks that I had observed everything that had happened and that I would testify as a witness if called to go to court;

8.  Prior to the trial in regards to the shooting death of Friday Gardner I got into legal trouble and went to prison but I was released before the trial took place and notified Michael Carter's family that I was still available to give testimony about what I observed on the 12th of September, 1999;

9.  Sometimes during June of 2002; I was informed that Junior's (Michael Carter) Mother had contacted my family members and left word that I was on Junior's (Michael Carter's witness list), and that I would be called into court;

10.  Although I was available and in Chicago, Illinois at all times in which the trial was going on, no lawyer or anyone else from the court contacted me or called me as a witness about the facts that happened on September 12, 1999;

11.  If called into court to testify to the facts stated herein, I will appear and attest to such facts as being true and correct to the best of my personal knowledge and belief.

*Id.* at 22–23.

[30] *Id.* at 22.

[31] *Id.*

Michella Anderson, Cheeks, and Stone with respect to Gard-
ner's drawing a weapon, and with Felicia and Michella An-
derson, and Stone, in identifying Stone as the only shooter.

In assessing the testimony of Calmese and McReynolds,
the state court concluded that it would have had little proba-
ble impact on the outcome of Mr. Carter's trial. Specifically, it
said that the testimony

> would not have been exculpatory and would
> have merely been cumulative of the testimony
> presented by Felicia Anderson, LaTonya
> Cheeks, Michell[a] Anderson, and co-defendant
> Stone. Defendant's theory of defense was pre-
> sented at trial and corroborated where these
> witnesses testified that the victim had a gun and
> defendant did not. The jury rejected this de-
> fense.

> Moreover, McReynolds' affidavit is insuffi-
> cient and unsupportive of defendant's defense.
> Specifically, defendant incorrectly relies on the
> affidavit to establish that he was unarmed and
> did not participate in shooting the victim.
> McReynold[s'] affidavit merely states that he
> only saw co-defendant Stone shoot a gun, and
> that defendant "scattered" to avoid being shot.
> He does not specify that defendant was un-
> armed or somehow uninvolved in the shooting.
> The same holds true for the police report re-
> garding Calmese, which merely documents that
> the police interviewed Calmese, who saw co-de-
> fendants Stone and Jones shoot the victim. It

does not state that defendant was unarmed or somehow uninvolved in the shooting.

Furthermore, the result of defendant's trial would have been the same even if Calmese and McReynolds had testified that defendant was unarmed where the jury was given the following accountability instruction:

> "A person is legally responsible for the conduct of another person when either before or during the commission of an offense with the intent to promote or facilitate the commission of an offense he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense. [] A person who is legally responsible for the conduct of another may be convicted for the offense committed by the other person even though the other person, who it is claimed committed the offense, has not been convicted."

The jury heard the evidence, received the instructions, and found defendant guilty. Any possible testimony from McReynolds and Calmese that defendant was unarmed would

> not have illuminated whether defendant was le-
> gally accountable for the actions of his co-de-
> fendants.[32]

It concluded its analysis with a final reference to its determi-
nation on direct appeal "that the evidence here was not
closely balanced."[33]

The court's analysis, while flawed, is ultimately not so far
off the mark as to be unreasonable. *See* 28 U.S.C. § 2254(d)(1);
*Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) ("A state
court decision must be more than incorrect from the point of
view of the federal court; AEDPA requires that it be 'unrea-
sonable,' which means something like lying well outside the
boundaries of permissible differences of opinion."). We are
uncomfortable with the state court's conclusion that the testi-
mony is "cumulative" and that the theory of defense was ad-
equately presented at trial and rejected by the jury. In reach-
ing this conclusion and noting specifically whose testimony
McReynolds and Calmese would echo, the state court makes
no mention of the fact that *all* of the witnesses it is referencing
are witnesses with a preexisting relationship to Mr. Carter
and therefore have a potential bias that would have been clear
to the jury. By contrast, Calmese was a witness with a rela-
tionship to *Gardner*, and McReynolds appears to be totally dis-
interested. This is a significant and noteworthy difference that

---

[32] *Id.* at 169–70 (third alteration in original) (citation omitted).

[33] *Id.* at 171. It also closed with a citation to the erroneous "unreliable or
fundamentally unfair" standard. *Id.* For the reasons set forth above, we do
not find this error consequential given the appropriate course of the anal-
ysis.

deserved to factor in to the state court's analysis. *Cf. Montgomery*, 846 F.2d at 414 ("Every one of these witnesses had a reason to be biased. Given the standoff between two factions…independent corroboration by a neutral, disinterested witness would perforce be extremely significant.").

Nevertheless, the remainder of the state court's analysis is sufficient to assure us that, despite this significant oversight, the conclusion that the new testimony did not create a substantial probability of acquittal is not unreasonable. In reaching this conclusion, the most significant factors are the competing theories of the case presented at trial: Stone argued self-defense, Mr. Carter argued mere presence, and the State argued accountability. Calmese's testimony is not valuable under these circumstances, because it identifies not just Stone but also Jones as shooters, undermining the sole-shooter scenario Stone had presented to the jury. Moreover, anything that confirms Jones's involvement is factually even more problematic for Mr. Carter under the accountability theory, because Mr. Carter's ties to Jones that day and at the moment of the shooting make a claim that Jones acted independently significantly less credible: Mr. Carter had gotten Jones involved in the dispute over the robbery; they spent the afternoon together; they drove to the building to begin the confrontation together; they fled together; and, outside of backing up Mr. Carter, Jones did not have a proverbial "dog in the fight" stemming from the original burglary or the people involved. Accordingly, to *truly* undercut the State's case, Mr. Carter's defense needed to distance him from the shooters, whether that be Stone alone or Jones and Stone. Calmese's testimony does not accomplish that result.

McReynolds's proffered testimony, for the reasons noted by the state court, also ultimately fails to furnish the linchpin of Mr. Carter's claim. Had the proffer included an *unequivocal* statement from McReynolds that he had watched the entire scene, that Stone was the only shooter, and that Mr. Carter and Jones were unarmed, we might well conclude, given McReynolds's disinterested status, that the state court's conclusion on prejudice was unreasonable. But as the State notes, McReynolds says *nothing* about Mr. Carter's activities prior to "scatter[ing]."[34] He does *not* say that he watched Mr. Carter and saw no gun and no shooting; he says only that he "*heard* several shots ring out from the alleyway," Stone's location, and "did not personally observe" any other shooting.[35] McReynolds does not specifically say that he *saw* Stone shoot. The phraseology is notably weak, and all of the potentially relevant factual assertions about the shooting comprise only three sentences, woefully lacking in detail. His further testimony that Mr. Carter and Jones scattered after Stone's shots to avoid being shot themselves is fairly characterized as adding somewhat of a gloss on the testimony of essentially every other witness that day, all of whom agree that all three of the defendants fled the scene. The most striking factual claim McReynolds makes in the affidavit is that he saw Gardner draw "an object out from behind his back," but this fact, while

---

[34] *See* R.14-2 at 22.

[35] *Id.* (emphasis added). If our review were de novo, we also would take notice of the fact that two witnesses who conceivably would have a pro-Gardner bias (Pearson, his girlfriend, and Gardner's friend Gaston, with whom he was speaking when Mr. Carter and Jones approached) gave equivalent testimony that *they did not see* Mr. Carter have a gun.

potentially significant to *Stone*'s self-defense claims, is irrelevant to Mr. Carter's mere presence defense.[36]

The state court indicated that this case was not a close one. That characterization may be a matter of some legitimate debate. The issue before us today is, however, a narrow one concerning only two pieces of additional evidence. Considering the limited potential value of that evidence, we conclude that the state court's assessment of the prejudice prong of *Strickland* cannot be characterized as unreasonable. [37]

---

[36] *Id.* We note that, although the accountability instruction was given to the jury, the State's closing argument claims that *all three* defendants were armed and ready to shoot. The jury convicted Mr. Carter following this argument and the instruction. The evidence before us now likewise does not undercut, in any significant way, the evidence presented that Mr. Carter himself was armed, insofar as neither witness definitively states that Mr. Carter was unarmed.

[37] We note that, on appeal, Mr. Carter concludes his brief by contending that the cumulative errors of his trial counsel rise to the level of constitutionally deficient performance. In addition to the principal claim regarding Calmese and McReynolds, he points to trial counsel's failure to adequately present a mere presence defense, instead deferring to Stone's counsel and a theory of self-defense, and a failure to argue for a limiting instruction on other crimes evidence. The parties dispute whether these arguments are procedurally problematic at this stage of the litigation, given the nature of the arguments presented in state court and in the district court. We need not resolve these procedural issues, however. The core of Mr. Carter's ineffective assistance argument is the witness testimony, and we have found the state court's assessment of the prejudicial effect of not presenting that testimony to be reasonable. Viewing the evidence presented at trial in its totality, *Strickland v. Washington*, 466 U.S. 668, 695-96 (1984), even if we could consider the additional claimed errors and agreed that they amounted to deficient performance, they are not so substantial

## Conclusion

The district court's resolution of the sole claim presented in Mr. Carter's federal habeas petition was correct. Although trial counsel's performance may have been deficient in failing to investigate potential witnesses, the state court's resolution of the prejudice analysis was not unreasonable within the meaning of 28 U.S.C. § 2254(d)(1). Accordingly, we affirm the judgment of the district court.

AFFIRMED

---

as to alter our assessment and demonstrate a reasonable probability of a different outcome to Mr. Carter's trial.

EASTERBROOK, *Circuit Judge*, concurring. We resolve this case as the parties have presented it. Whether they have presented it correctly is doubtful.

For example, at page 18 the court applies the circuit's doctrine that, because the state judiciary bypassed the "performance" component of *Strickland v. Washington*, 466 U.S. 668 (1984), the federal judiciary's assessment is unaffected by 28 U.S.C. §2254(d), even though the state judiciary rejected the ineffective-assistance claim on the merits by concluding that the contested aspects of counsel's performance did not prejudice Carter. I think that §2254(d) governs both elements of *Strickland* once the state judiciary decides an ineffective-assistance claim. Section 2254(d) applies when a state court resolves a "claim" on the merits. Performance and prejudice are distinct issues, to be sure, but there is only one "claim." See *Thomas v. Clements*, 797 F.3d 445 (7th Cir. 2015) (opinion respecting the denial of rehearing en banc). But Illinois has not asked us to revisit the cases cited at page 18 & n.19.

When analyzing the performance element of *Strickland*, the court asks only whether counsel may have erred by not interviewing and calling two potential witnesses. That's the way Carter framed the issue. It is the wrong question to ask. *Strickland* directs a court to examine the totality of counsel's performance, not to concentrate on a supposed error while losing sight of what the lawyer *did* for his client. See *Strickland*, 466 U.S. at 690–96; *Williams v. Lemon*, 557 F.3d 534 (7th Cir. 2009) (applying this aspect of *Strickland* to another proceeding in which a prisoner contended that counsel had not interviewed and called witnesses). As happens too often, however, lawyers for the state have gone along with the petitioner's

(understandable) desire to focus attention on what trial counsel arguably omitted, rather than the full course of representation. But this does not imply that it is right to ignore what Carter's lawyers did and focus only on what arguably did not occur.

I said "arguably" in the last two sentences because we do not know whether counsel interviewed McReynolds or Calmese, or what considerations influenced the decision not to call them. We have only Carter's views. That's because counsel have never been called on to say what they did and explain why they did (or didn't) do any particular thing, and no judge has decided whether Carter's allegations are true. The state might well have invoked 28 U.S.C. §2254(e)(2), which provides that a petitioner who bypassed an opportunity to build a record in state court can't complain in federal court about the deficiencies of the record. As the court's opinion explains (pages 23–24 & n.23), Illinois has waived any opportunity to rely on this statute. It may be, as the prosecutor has told us, that in Illinois a petitioner need not invariably make a separate request for a hearing. But Carter not only never requested an evidentiary hearing but also did not complain on appeal in the state system about the absence of one. He evidently wants both state and federal judges to assume that his view of what occurred is all that matters. That can't be right. It is not sensible—indeed, usually it is not possible—to decide that defense counsel furnished ineffective assistance without hearing from the lawyer what happened and why.

For reasons the court's opinion gives, however, none of these issues affects the outcome. I therefore join the court's opinion, but I also hope for better performance from appellate counsel in future ineffective-assistance litigation.